UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | |
|---|---|
| In re: ) | |
| ) | |
| **KIMBERLY MICHELLE MAYHEW,** ) | **Case No. 08-10628 HRT** |
| ) | **Chapter 7** |
| **Debtor.** ) | |
| ) | |
| ) | |
| **CONSOLIDATED HARDWOODS, INC.,** ) | **Adversary No. 08-01252 HRT** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **KIMBERLY MICHELLE MAYHEW,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for trial on the Plaintiff's Complaint. Following the submission of written closing arguments (docket ##69, 76, 85), the Court took the matter under advisement. The Court is now prepared to rule, and hereby finds and concludes as follows.

### FACTUAL BACKGROUND

In 1999, the Defendant, Debtor Kimberly Michelle Mayhew ("Debtor"), and her then-husband, Doug Mayhew ("Doug," and together with the Debtor, the "Mayhews"), purchased real property located at 307 Labelle Road, Boulder, Colorado, with the intention of building their dream home (the "Home") on the then-vacant land. The Home was to be built by Doug's construction company, which was initially formed as Rocky Mountain Custom Construction, Inc. and later changed to Mayhew Industries, Inc. ("MII"). At all times relevant to this matter, Doug was the 100% owner of MII. At some point after MII was formed, the Debtor began to serve as its corporate secretary, and she was added as a signatory on MII's bank accounts. The Debtor also served as MII's bookkeeper. At all times relevant to this matter, the Debtor was employed full-time by Kaiser Permanente as a physician, and the Mayhews had two young children.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

### Mayhews' Construction Loan and Mortgage

In 2001, the Mayhews obtained a construction loan in the maximum amount of $999,999 (the "Construction Loan") from Community First Bank, now known as Bank of the West. The Construction Loan was renewed and extended each year from 2001 to 2004, but in the fall of 2004, when the Construction Loan was fully drawn down, Community First Bank informed the Mayhews that the Construction Loan would not be further extended or increased in 2005. The Mayhews then began to look for permanent financing.

In September 2005, the Mayhews obtained a $999,999 mortgage from Cherry Creek Mortgage Company (the "Cherry Creek Mortgage Debt"), all the proceeds of which were used to pay off the outstanding balance of the Construction Loan. No amount of the Cherry Creek Mortgage Debt was disbursed to MII or to the Mayhews.

### Other Debt Incurred by the Mayhews and MII

In October 2005, the Debtor obtained a $350,000 Home Equity Line of Credit from the CIT Group (the "CIT Debt"), which was secured by a second mortgage on the Home. The line of credit was fully drawn down at the initial closing, and the proceeds were used to pay certain of the Mayhews' personal debts and certain of MII's debts.

The Mayhews personally borrowed other funds that they deposited into MII's checking account, including approximately $140,000 from Doug's parents (borrowed between 2003 and 2005); approximately $175,000 from a home equity line of credit obtained by the Debtor; approximately $25,000 from an advance on the Mayhews' United Mileage Visa card; and approximately $71,000 from an advance on the Mayhews' MBNA (later Bank of America) Visa.

The Mayhews also used their personal credit cards to pay MII's expenses. Each month when the Debtor received the personal credit card bills, she separated out the Mayhews' personal expenses from MII's business expenses, writing a personal check to pay the personal expenses and an MII check to pay the business expenses.[1] On some occasions, MII funds were used to pay the Mayhews' personal expenses such as child care, but on each of those occasions, the amounts were classified as distributions and treated as income to Doug. MII retained a CPA to assist with review and classification of expenses and to prepare appropriate tax returns. MII's office was located in the Home, so MII paid a portion of the Home's utilities and for its own

---

[1] Consolidated argues that by paying some amount of the Mayhews' personal credit card bills with MII checks, the Debtor or the Mayhews improperly paid personal expenses with company funds. The Court does not so find. The evidence before the Court was clear that the MII checks were sent to the credit card companies as payments for MII's business expenses that the Mayhews had charged to their personal credit cards.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

telephone line. MII also paid for cell phones for each of the Mayhews and paid for cars driven by the Mayhews. The CPA assisted with the determination of the amounts owed for personal use of the company cars and for the company's construction of the Home.

Finally, MII's business checking account with Guaranty Bank had an overdraft line of credit in the amount of $100,000. Funds were automatically advanced from the line of credit when checks drawn on MII's account exceeded the account balance.

### MII's Orders from Consolidated and State Court Judgment

MII opened an account with the Plaintiff, Consolidated Hardwoods, Inc. ("Consolidated"), in February 2003, but according to the evidence before the Court, MII did not order any wood product from Consolidated until November 2004. That first order, in the amount of $451.56, was for wood product used in construction of a home other than the Mayhews' Home, and the invoiced amount was paid in full.

In December 2004, MII ordered wood trim to be used for the Home, for which Consolidated invoiced MII $12,436.81. MII paid approximately one-half of the amount, $6,669.97, in January 2005, and disputed the remaining charges. As of January 31, 2005, the balance due on MII's open account was $6,318.45, including finance charges. In February 2005, MII ordered $4,199.80 of trim from Consolidated, which was paid in full in May 2005. Also, in May 2005, MII paid Consolidated an additional $2,000 on the past-due balance. In July 2005, MII ordered $4,991.85 in trim, which was added to MII's open account. By the end of July 2005, the balance due on MII's open account was $9,928.70.

In March 2006, the Debtor sent Consolidated a settlement offer, which was not accepted. Instead, Consolidated filed suit in Broomfield County, Colorado District Court (the "State Court"), against MII, to recover the amount due on the open account, and against the Mayhews, individually, as guarantors. MII and the Mayhews asserted counterclaims against Consolidated. In March 2007, after a two-day jury trial, the State Court entered judgment against MII and the Mayhews, jointly and severally, in the amount of $9,210, less a setoff of $703 based on MII's counterclaim. The State Court subsequently awarded Consolidated its costs and attorney's fees, in the amount of $1,668.95 for costs and $27,575 for attorney's fees, for a total judgment of $39,156.95, with post-judgment interest at 1.5% per month from March 20, 2007.

### Debtor's Bankruptcy Filing

On January 21, 2008, the Debtor filed her Chapter 7 bankruptcy petition. On her Schedule D, she listed the Cherry Creek Mortgage Debt, then held by Wells Fargo Home Mortgage, in the amount of $1,036,000.33, and described it as "First mortgage on spec home located at 307 Labelle Road, Boulder, CO. Funds paid to Mayhew Industries, Inc. to build a spec home in which Debtor used to live." She also listed the CIT Debt, then held by Indymac

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

Bank, in the amount of $360,835.15, and described it as "Second mortgage on spec home located at 307 Labelle Road, Boulder, CO. Funds paid to Mayhew Industries, Inc. to build a spec home in which Debtor used to live."

On March 27, 2008, Consolidated timely filed the above-captioned adversary proceeding, objecting to the dischargeability of the Debtor's debt to it, under 11 U.S.C. § 523(a)(4).

## DISCUSSION

Section 523(a)(4) of the Bankruptcy Code provides that an individual's Chapter 7 discharge does not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 524(a)(4). As the Plaintiff seeking a determination of nondischargeability, Consolidated bears the burden of proving (1) the existence of a fiduciary relationship between it and the Debtor, and (2) a defalcation committed by the Debtor in the course of that fiduciary relationship. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996).

### 1. Existence of Fiduciary Relationship between Consolidated and Debtor

Consolidated relies on the Colorado Mechanics' Lien Trust Fund Statute, Colo. Rev. Stat. § 38-22-127 (the "TFS"), which has been held to create a trust sufficient to establish a fiduciary relationship for purposes of § 523(a)(4). *See Fowler & Peth, Inc. v. Regan (In re Regan)*, 477 F.3d 1209, 1211 n.1 (10th Cir. 2007). In order to determine whether the TFS establishes a fiduciary duty applicable to the Debtor, the Court must determine (a) whether Consolidated has shown that funds were disbursed to the Debtor or to MII "under any building, construction, or remodeling contract or on any construction project," so as to constitute a trust res under the TFS; (b) whether Consolidated has shown that it holds an unpaid claim covered by the TFS; (c) whether the Debtor exercised sufficient control over the disbursed funds specifically, or MII's finances generally, to support the imposition of personal fiduciary liability under the TFS; and (d) whether the "safe harbor" exception of the TFS applies. The Court will consider each element separately.

#### A. Trust Res

The TFS establishes a trust res consisting of "All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project . . . ." Colo. Rev. Stat. § 38-22-127(1). Here, the parties dispute whether any or all of the funds borrowed by MII or the Mayhews fall within the TFS.

The Colorado Supreme Court clarified the scope of the TFS in *Yale v. AC Excavating, Inc.*, 295 P.3d 470, 476-77 (Colo. 2013), holding:

Page 4 of 12

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

> Certainly, payments received for work performed on a construction project fall within the scope of [the TFS]. Proceeds from construction loans to finance a construction project likewise fall within the scope of the provision. On the other hand, a loan or voluntary contribution given to capitalize a business is disbursed to the business itself and may be used to pay for any of the company's obligations, including general operating expenses (e.g., taxes, utilities, rent, etc.). Such loans or capital contributions are not "funds disbursed" "under [a] building, construction, or remodeling contract or on [a] construction project" that must be held in trust under [the TFS] for the benefit of subcontractors.
>
> . . . .
>
> To determine whether particular funds were disbursed to a contractor "on [a] construction project," a court should consider the totality of the circumstances, bearing in mind the statute's purpose of protecting homeowners, subcontractors, laborers, and suppliers against unscrupulous contractors. Relevant considerations include who disbursed the funds; the relationship between the disburser and the contractor or subcontractor receiving the funds; and the circumstances of the disbursement, including whether the funds were earmarked for construction, whether conditions were placed on the disbursement indicating the funds were to be dedicated to a construction project, and any other evidence of the disburser's intent to disburse funds on a construction project.

*Id.* at 476-77 (footnotes omitted).

As to the Construction Loan, there can be little doubt that those funds were disbursed on a building or construction contract or project, and the Court finds that the proceeds of the Construction Loan, in the amount of $999,999, constitute trust funds under the TFS.

As to the Cherry Creek Mortgage Debt, which was used to pay off the outstanding balance of the Construction Loan, neither the Mayhews nor MII received any additional proceeds from the debt. No evidence supports a conclusion that the debt was intended to provide funds for additional construction. The Cherry Creek Mortgage Debt does not fall within the TFS.

As to the CIT Debt, which was obtained by the Debtor personally as a home equity line of credit, the Court cannot find that the funds were earmarked for specific construction projects. True, the Debtor described the CIT Debt on her schedules as "Funds paid to Mayhew Industries, Inc. to build a spec home in which Debtor used to live," which would support a conclusion that

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

the CIT Debt falls within the TFS. But, the Debtor's description is not, itself, determinative.[2] Instead, the Court must consider the totality of the circumstances, including Debtor's testimony – both on the reason she so characterized the debt on her schedules and on the actual uses of the funds disbursed – and the settlement sheet showing the specific uses of the funds disbursed. The Court finds that the funds were not obtained for a specific building or construction project. Instead, the CIT Debt is analogous to the general operating loans or capital contributions found to be outside the scope of the TFS in *Yale v. AC Excavating*.

As to the other funds borrowed by the Mayhews personally and deposited into MII's checking account, including approximately $140,000 from Doug's parents (borrowed between 2003 and 2005); approximately $175,000 from a home equity line of credit obtained by the Debtor; approximately $25,000 from an advance on the Mayhews' United Mileage Visa card; and approximately $71,000 from an advance on the Mayhews' MBNA (later Bank of America) Visa, no evidence supports a conclusion that those funds were earmarked for construction. None of those funds fall within the scope of the TFS.

Finally, as to funds deposited into MII's business checking account because of its overdraft line of credit with Guaranty Bank, no evidence supports a conclusion that the funds were advanced for specific construction projects, as opposed to general operating expenses of MII. These general loans are similar to those found to be outside the scope of the TFS in *Yale v. AC Excavating*.

In conclusion, the Court finds that Consolidated has established a trust res, in the amount of the $999,999 Construction Loan, which falls within the scope of the TFS. The Court cannot find that any other funds received by the Debtor or MII fall within the scope of the TFS.

### B.     Consolidated's Claim Covered by the TFS

The Debtor argues that because the Construction Loan was fully drawn down before MII placed its December 2004 order with Consolidated, Consolidated's unpaid claim falls outside of the scope of the TFS. The Court cannot so find, based on the evidence presented. The fact that a claim was incurred near the end of a construction project does not mean that the claim falls

---

[2] Any finding that the Debtor's description of the CIT Debt on her schedules was determinative of the nature of the debt would have to be based on the doctrine of judicial estoppel, which is disfavored generally, and which is inapplicable here because the Court cannot find that the Debtor succeeded in persuading this Court to accept her earlier position. *See Eastman v. Union Pac. R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (discussing requirements of judicial estoppel, including judicial acceptance of a prior, inconsistent position). Whether the funds were provided to MII for construction of the Home has not previously been decided by this Court.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

outside the scope of the TFS; the statute's protection is not limited to those who perform work early in the course of a project. Instead, the TFS requires a contractor to hold all funds in trust pending the anticipated *completion* of a construction project. *People v. Collie*, 682 P.2d 1208, 1210 (Colo. Ct. App. 1983) (The TFS protects laborers and materialmen by "requiring all contractors to hold in trust their customers' advance payments received if any independent laborers or materialmen will be necessary to *complete* a particular job.") (emphasis added), *cited in Mangum v. Siegfried (In re Siegfried)*, 5 Fed. Appx. 856 (10th Cir. 2001) (unpublished); *see also Flooring Design Assocs., Inc. v. Novick*, 923 P.2d 216, 219 (Colo. Ct. App. 1995) (emphasizing that the protections of the TFS extend to "the last sub-contractors on the job," even if those subcontractors are unable to submit their invoices until after the closing date of the construction loan).

If a contractor spends all the trust funds he receives on claims that fall within the scope of the TFS, but ultimately the funds are insufficient to pay all claims in full, then no liability attaches under the TFS. *See ASCI Readi-Mix and Asphalt Specialties, Inc. v. Gamboa (In re Gamboa)*, 400 B.R. 784, 790 (Bankr D. Colo. 2008); *cf. People v. Erickson*, 695 P.2d 804, 805-06 (Colo. Ct. App. 1984) (evidence that all funds received were disbursed to laborers, subcontractors, or material providers on the project provides a defense to liability under the Trust Fund Statute). But, the contractor, as the fiduciary, has the burden to provide an accounting of how the funds were used, in order to show that all the funds were used to pay claims that fall within the TFS. *Gamboa*, 400 B.R. at 789-90; *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997) (describing the shifting burdens), *overruled on other grounds by Bullock v. BankChampaign, N.A*, 133 S.Ct. 1754 (2013). Here, no such accounting was provided. In the absence of an accounting showing that all Construction Loan proceeds were paid to those holding claims covered by the TFS,[3] the Court cannot conclude that the proceeds were spent on appropriate claims, prior to the time that Consolidated's claim was incurred. As a result, the Court cannot find that Consolidated's claim falls outside the scope of the TFS.

---

[3] In order to comply with the TFS, a contractor must show that all trust fund proceeds were spent on claims that fall within the TFS. A showing that some of the proceeds were spent on business expenses, even otherwise appropriate expenses such as office overhead or taxes, is not sufficient for TFS purposes. *See Alexander Co. v. Packard*, 754 P.2d 780 (Colo. Ct. App. 1988) (paying other corporate expenses from trust funds, ahead of the claims of materialmen, was breach of fiduciary duty under the TFS). Here, any payments of Construction Loan proceeds on expenses such as general office overhead, telephone service, interest payments, or car payments, or any distributions to Doug as shareholder, would show a lack of compliance with the TFS. Because the Court has no accounting showing how the proceeds of the Construction Loan were spent, the Court does not specifically find lack of compliance with the TFS; instead, the Court's finding is based on a failure to provide an accounting and attendant failure to meet the applicable burden of proof.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

### C. Debtor's Control of Funds

Consolidated may have established a general claim to the proceeds of the Construction Loan under the TFS, but in order to prevail on its claim against the Debtor, Consolidated must show that the Debtor had sufficient control over the disbursed funds specifically, or MII's finances generally, to support the imposition of personal fiduciary liability under the TFS. *See, e.g., Packard*, 754 P.2d at 782 (defendant who controlled the finances of the construction company is personally liable for breach of TFS fiduciary duty); *Novick*, 923 P.2d at 221 (defendant who made financial decisions for the corporations and controlled their finances was personally liable).

Here, the Debtor argues that she lacked sufficient control over the Construction Loan proceeds and their disbursement to support the imposition of personal fiduciary liability under the TFS. She argues that her role in connection with MII was ministerial, limited to writing and signing checks at Doug's direction. She testified that she did not decide which construction invoices to pay, as she was not involved in the day-to-day operations of MII. The Court had the opportunity to observe the Debtor's testimony and found her to be a credible witness. The Court agrees that the Debtor's role in MII was ministerial, and the Court finds that Doug, not the Debtor, was the one responsible for deciding which construction invoices to pay. If the question before the Court were whether the Debtor exercised sufficient control over MII's finances that she should be found liable for breach of duty relating to funds entrusted to MII, the Court would not hesitate to find that the Debtor lacked sufficient control. *See, e.g., Kruze v. Murray*, 408 B.R. 268 (Bankr. W.D. Mo. 2009) (finding no personal liability for a debtor whose role in the business was limited to performing administrative tasks at the direction of her husband). But, in this case, the Construction Loan proceeds were not disbursed to MII; they were disbursed to the Mayhews individually. A personal fiduciary duty must attach to the personal receipt of funds disbursed from a construction loan. Accordingly, the Court finds that the Debtor had sufficient control over the disbursed funds to support the imposition of personal fiduciary liability under the TFS.

### D. Safe Harbor

The TFS includes a "safe harbor" for certain claims, providing as follows:

(2) This section shall not be construed so as to require any such contractor or subcontractor to hold in trust any funds which have been disbursed to him or her for any subcontractor, laborer or material supplier, or laborer who claims a lien against the property or claims against a principal and surety who has furnished a bond under the provisions of this article if such contractor or subcontractor has a good faith belief that such lien or claim is not valid or if such contractor or subcontractor, in good faith, claims a setoff, to the extent of such setoff.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

Colo. Rev. Stat. § 38-22-127(2).

As the party seeking to show an exception to liability under the "safe harbor" provision of the TFS, the Debtor bears the burden of proving her good faith belief that Consolidated's lien or claim was not valid. *See generally Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo.1992) (the burden is on defendant to assert and prove any affirmative defenses); Cathy S. Krendl, *Colorado Practice Series, 1C Methods of Practice* 268, § 48.20 (5th ed. 2006) (listing examples of affirmative defenses to mechanic's lien foreclosure actions).

The parties have not cited, nor has this Court's research located, any case law setting forth the required standards for a finding of "good faith" under this subsection. The Court assumes, without deciding, that good faith includes both subjective and objective components. As to the subjective component, the Debtor testified that she relied on Doug to decide whether a particular construction invoice should be paid, given her lack of involvement with the day-to-day construction work. She testified that, in the case of Consolidated's December 2004 and July 2005 invoices, she received information from Doug that there were problems with the wood provided, and the full balance of the invoices should not be paid. MII did pay approximately one-half of the December 2004 invoice, $6,669.97, in January 2005, plus an additional $2,000 in May 2005. MII and the Mayhews attempted to resolve the disputes regarding the December 2004 and July 2005 invoices by making a settlement offer in March 2006 and by participating in mediation with Consolidated. The Debtor testified that at all relevant times while Consolidated was seeking payment of the remaining invoice balances and associated finance charges, MII had sufficient funds available to pay the invoices, but the Debtor believed that Consolidated was not entitled to full payment, either due to problems with the wood or due to finance charges that the Debtor believed were improper. The Debtor's testimony was credible, and the Court finds that the Debtor had a subjectively honest, good faith belief that the balance of Consolidated's claim was not valid or that MII was entitled to a complete setoff.

As to the objective component, whether the Debtor's belief was reasonable, the Court has considered the Debtor's testimony and has reviewed the transcript of the evidence presented to the State Court, including the testimony of Doug and that of MII's former employee, Tony Mitchell. Both men testified as to specific problems with the wood that Consolidated provided, including that it was the wrong size and the wrong grade. The Court is particularly persuaded by the testimony of Mr. Mitchell, who was not employed by MII at the time of the State Court trial and had no reason to be anything other than truthful before that court. The State Court found sufficient factual evidence of a dispute to submit MII's counterclaim against Consolidated to the jury. After deliberation, the jury did not fully accept MII's counterclaim, awarding only a partial setoff of $703 against MII's liability of $9,210. But, the existence of a reasonable belief is not determined by ultimate success in litigation. *Cf. People v. Anderson*, 773 P.2d 547, 546 (Colo. 1989) (existence of a good faith dispute as to lien claims was separate from whether the lien claims were successfully challenged in litigation). The Court finds that the Debtor's belief that

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

Consolidated's claim was not valid or that MII was entitled to a complete setoff was supported by other evidence and was objectively reasonable.

Consolidated argues that, once the State Court entered judgment in its favor, the Debtor no longer had a good faith basis for disputing its claim, and any setoff should be capped at $703, as determined by the jury. But, there is no basis for retroactive imposition of fiduciary duty, after the entry of the State Court judgment. If a party falls within the safe harbor exception, there is no duty to hold funds in trust. Colo. Rev. Stat. § 38-22-127(2). Here, because the Debtor had a good faith belief that Consolidated's claim to the remaining amount of the December 2004 invoice (after the January payment, approximately $5,766.84, plus finance charges, or after the May payment, approximately $3,766.84, plus finance charges) or the July 2005 invoice was not valid or was subject to a setoff of at least that amount, she had no duty to hold any funds in trust to pay Consolidated, and was free to spend available funds on other expenses.

In the absence of a specific fiduciary duty to hold funds in trust to pay Consolidated, there is no applicable fiduciary duty under § 523(a)(4). *See Employer's Workers Compensation Association v. Kelley (In re Kelley)*, 215 B.R. 468, 473 (10th Cir. BAP 1997). Consolidated's claims, based on breach of fiduciary duty, must fail. Out of an abundance of caution, the Court will nevertheless discuss below the remaining element of Consolidated's § 523(a)(4) claim.

### 2. Defalcation

For purposes of this discussion, the Court will assume that the Debtor did not fall within the safe harbor exception to the TFS. Consolidated has shown the existence of a trust res and an unpaid claim to those funds, and the Debtor has failed to provide an accounting. Under prior precedent, that may have been sufficient to find a "defalcation" under § 523(a)(4). *See, e.g., Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997) (holding that a defalcation is any failure to account for funds entrusted to the fiduciary, whether intentional, willful, reckless, or negligent). But, the Supreme Court overruled *Storie* and similar cases in *Bullock v. BankChampaign, N.A*, 133 S.Ct. 1754 (2013).

In *Bullock*, the Supreme Court held that a plaintiff seeking to have a debt declared nondischargeable under § 523(a)(4) for defalcation while acting in a fiduciary capacity must establish that the defendant acted with a specific mental state, either actual knowledge of wrongdoing, or "reckless conduct of the kind that the criminal law often treats as the equivalent," including actions where the fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 1759-60 (quoting ALI, Model Penal Code § 2.02(2)(c), at 226, and § 2.02 Comment 9, at 248 (1985) (explaining that the Model Penal Code's definition of "knowledge" was designed to include "wilful blindness")). The substantial and unjustifiable risk "'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* at 1760 (quoting ALI, Model Penal Code § 2.02(2)(c), at 226).

Considering all of the evidence before the Court, the Court cannot find that the Debtor acted with the requisite mental state. The Debtor performed her duties as MII's bookkeeper in good faith. She made a conscientious effort to ensure that valid corporate expenses were paid,[4] and she appropriately relied on others with more expertise, including Doug and Tony Mitchell with regards to payment of construction invoices, and the CPA with regards to the treatment or classification of certain expenses. When the Debtor realized that she and Doug would not be able to continue to support the debt on the Home, they took steps to finish the construction and sell the Home. When MII's funds were insufficient to cover the cost of completing the Home, the Debtor and Doug incurred substantial personal debt to infuse additional capital into MII.

As to the specific treatment of Consolidated's invoices, the Court finds that the Debtor believed that the full amount of the balance sought was not owed, due to problems with the wood product delivered or due to finance charges that the Debtor believed were improper. MII and the Mayhews attempted to resolve this dispute in good faith, some evidence of which is the March 2006 settlement offer that the Debtor communicated to Consolidated. That settlement offer, in the amount of $4,651.36, represented 46.85% of the amount owed as of July 2005 and 54.68% of the amount awarded by the jury in the State Court litigation. MII and the Mayhews also participated in mediation with Consolidated, but were unable to reach a resolution to their dispute.

As to the Debtor and MII's general compliance with their obligations to pay claims falling within the TFS, the Debtor credibly testified that all other suppliers were paid, either in full or in a mutually agreed amount after participation in dispute resolution. Of the three lien claims that were filed, MII and the Mayhews were able to resolve two of the three in mediation, leaving only that of Consolidated as an outstanding claim.

Considering the Debtor's good faith performance of her duties as an unpaid bookkeeper, MII's treatment of TFS claims in general and Consolidated's claims in particular, the Court cannot find that the Debtor took a substantial, unjustified risk that any TFS claims in general, or the claim of Consolidated in particular, would remain unpaid. Accordingly, even if the Debtor had a fiduciary duty to set aside funds to pay Consolidated's claim, the Court cannot find that the

---

[4] Consolidated made several arguments attacking the Debtor's character, including accusing the Debtor of committing tax fraud and participating in other schemes to avoid paying Consolidated. The Court does not find Consolidated's arguments to be well-grounded in fact or in law.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 08-01252 HRT

Debtor committed a defalcation, as that term has been defined by the Supreme Court. Consolidated's claims will therefore be dismissed.

## CONCLUSION

For the reasons discussed above, the Court finds and concludes that the Debtor falls within the "safe harbor" exception of the TFS, Colo. Rev. Stat. § 38-22-127(2), and had no fiduciary duty to set aside trust fund proceeds to pay Consolidated's claim. The Court further finds and concludes that the Debtor did not commit a defalcation because she did not act with the requisite mental state, as set forth by the Supreme Court. Accordingly, it is

HEREBY ORDERED that Consolidated's claims against the Debtor must be dismissed. The Court will, by separate order, enter judgment in favor of the Debtor on Consolidated's complaint.

Dated this  27th  day of February, 2014.

BY THE COURT:

*Howard Tallman*
Howard R. Tallman, Chief Judge
United States Bankruptcy Court